UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT AMTHOR,

     Plaintiff,

v.

COUNTY OF MACOMB,
CHARLES SEIDELMAN,
KAREN BATHANTI,
POLICE OFFICERS ASSOCIATION OF
MICHIGAN,
MACOMB COUNTY JUVENILE JUSTICE
ASSOCIATION,
ERICK ACRE,
JAMES MCMAHON,

     Defendants.

Case No.  2:13-cv-14100
Honorable Laurie J. Michelson
Magistrate Judge R. Steven Whalen

---

**OPINION AND ORDER GRANTING IN PART COUNTY OF MACOMB'S MOTION
FOR SUMMARY JUDGMENT [33] AND GRANTING POLICE OFFICERS
ASSOCIATION OF MICHIGAN'S MOTION FOR SUMMARY JUDGMENT [34]**

---

In 2011, Scott Amthor testified during the Equal Employment Opportunity Commission's

investigation into a complaint filed by a coworker at the Macomb County Juvenile Justice

Center. About two weeks after his testimony, Charles Seidelman, the Center's director, allegedly

yelled at Amthor and ordered a supervisor to reprimand Amthor. And about two months later,

Seidelman moved Amthor to the midnight shift—a shift Amthor had not worked in his over-

seven years at the Center. Amthor remained on that shift for over two years, despite at least twice

seeking day-shift openings. Amthor says that this all happened because he gave testimony to the

EEOC. Amthor also maintains that his union, Police Officers Association of Michigan and its

local branch, Macomb County Juvenile Justice Association, did not adequately stand up to

Seidelman for him. So Amthor filed this lawsuit against Seidelman, Macomb County, and one of

2:13-cv-14100-LJM-RSW   Doc # 40   Filed 04/20/15   Pg 2 of 41   Pg ID 859

the County's human-resources directors, as well as his union and two of its representatives, alleging retaliation in violation of both Title VII of the Civil Rights Act of 1964 and Michigan's Elliott-Larsen Civil Rights Act.

Presently before the Court are two summary-judgment motions: one filed by Defendants County of Macomb, Charles Seidelman, and Karen Bathanti (the "County Defendants") (Dkt. 33, "County's Mot.") and one filed by Defendants Police Officers Association of Michigan, Macomb County Juvenile Justice Association, Erick Acre, and James McMahon (the "Union Defendants") (Dkt. 34, "Union's Mot."). The Court has been adequately advised by the briefing and so will forgo oral argument. *See* E.D. Mich. LR 7.1(f). On this record, a reasonable jury could find that Seidelman transferred Amthor to the night shift because of Amthor's EEOC testimony, so the Court will GRANT IN PART and DENY IN PART the County Defendants' motion. As for the Union Defendants, Amthor has not established the requisite connection between his protected conduct and their conduct, so the Union Defendants' motion will be GRANTED in full.

## I.

Because Defendants move for summary judgment, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-movant, Amthor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.

Defendant Macomb County operates the Macomb County Juvenile Justice Center (the "Center"), a round-the-clock detention and treatment center for ten to seventeen year olds remanded into custody by Michigan's family courts. To help supervise the 40 to 110 youth that resided at the Center during the times relevant to this suit, the Center employed approximately

105 "Youth Specialists," one of whom was Amthor. (Seidelman Dep. at 9–10; Amthor Dep. at 49.) The duties of a Youth Specialist depended in part on which of three shifts—day (7:00 a.m. to 3:00 p.m.), afternoon (3:00 to 11:00 p.m.), or night (11:00 p.m. to 7:00 a.m.)—the specialist worked. During the day, the Center provides therapy, treatment, and other activities for its residents. At night, however, the residents are confined to their rooms. As such, the night shift involves less interaction with the youth. (*See* Dkt. 34, Union's Mot. Summ. J. Ex. 9, Amthor Dep. at 52.)

Youth Specialists employed by the Center were members of Defendant Macomb County Juvenile Justice Association (the "Local Union"), a branch of Defendant Police Officers Association of Michigan ("POAM"). Defendant Erick Acre, who also worked as a Youth Specialist at the Center, served as president of the Local Union during times relevant to this lawsuit. (Acre Dep. at 8.)

Plaintiff Scott Amthor holds a degree in social work and began working for the Center as a Youth Specialist in June 2004. (Amthor Dep. at 22–23.) In Amthor's words, "that's why I went to college, you know, to help troubled youth." (Amthor Dep. at 52.) For his first seven years at the Center, Amthor worked the afternoon shift. (*See* Amthor Dep. at 49.)

In July 2011, Defendant Charles Seidelman, the Center's director, transferred Amthor to the day shift, effective September 2011. (Dkt. 38, Macomb's Reply Ex. I, July 26, 2011 Email from Seidelman to Amthor.) Amthor alleges that Seidelman exercised his discretion in selecting whom to transfer to the day shift, but the undisputed evidence implies otherwise. Macomb has produced emails from those expressing interest in the July 2011 day-shift opening, and a hire-date spreadsheet showing that, among those that expressed interest, Amthor had the most seniority. (*See* Macomb's Reply at 2, Exs. G, H.) Thus, as Amthor stated in a 2012 letter, "Mr.

Seidelman eventually, per Union contract had to place me on the day shift." (Macomb's Reply Ex. F, Undated Amthor Letter.) The distinction matters because Amthor finds it suspicious that, four months later, Seidelman "suddenly and inexplicably" changed his mind as to the shift that Amthor should work.

**B.**

The events giving rise to Amthor's claim of retaliation started in 2011.

One involved Amthor's decision to, on his own initiative, personally investigate whether Defendant Acre was receiving a kick-back by selling gift cards to the Local Union. Sometime in 2011 (the record does not tell us when) Acre had directed the Local Union's purchase of gift cards to be raffled at the Local Union's holiday party. The gift cards, however, were purchased through the school that Acre's children attended (the school had a "scrip" fundraising program). (Amthor Dep. at 24–26.) In Amthor's and his co-worker Allen Pettygrue's opinion, the treasurer of the Local Union should have been handling the purchase, so Amthor (and possibly Pettygrue) went to the school to determine if Acre was receiving any benefit from the sales. (*See* Amthor Dep. at 24–25; Acre Dep. at 14.) Acre recalled, "I wish they would have came and asked the question instead of approaching my children's school. That's their right to ask as [union] members. . . . I was upset they went to the school." (Acre Dep. at 17.) It turned out that Acre's children did receive a small tuition deduction—$18. (Acre Dep. at 15–16, 66.) (Acre said he ultimately paid the Local Union back by purchasing $50 worth of cakes for the holiday party. (*Id.*))

Sometime after this gift-card incident, Seidelman, as Director of the Center, created a new "group facilitator" position. Group facilitators were Youth Specialists, but with a more particularized role. In brief, Seidelman testified that he "created a temporary assignment of group

4

facilitators" with some discretion in responding to misbehaving youth. (*See* Seidelman Dep. at 41.)

At one of the first meetings under the group-facilitator program, Pettygrue and Acre had a dispute. Acre stated at the meeting that a resident had been describing himself as a racist: "[The resident] hated all white people. The resident said that [about himself]." (Acre Dep. at 18.) According to Acre, he and Pettygrue then had a brief verbal exchange, "[t]hen Mr. [Pettygrue] . . . pretty much he called me a racist, maybe you are a racist." (Acre Dep. at 18–19.) Amthor, who was at the meeting, recalled Pettygrue's response differently: "Pettygrue said, 'Well, the resident thinks the same thing about you.'" (Amthor Dep. at 32; *see also id.* at 33.) Amthor further recalled, "Then Mr. Acre stormed out [of the meeting] and came back in later and basically told Mr. Pettygrue that he didn't like the fact that he was causing a racially hostile work environment toward him." (Amthor Dep. at 32.) Acre denies complaining that Pettygrue created a racially hostile work environment, but admits that he "complain[ed] that supervisors and assistant directors [had done] absolutely nothing when things started to go the wrong way." (Acre Dep. at 19–20.)

Although the timing is again unclear from the record, Macomb County's human resources department and corporate counsel conducted an investigation into an apparently unrelated harassment complaint and uncovered the confrontation between Acre and Pettygrue. (Seidelman Dep. at 17.) Seidelman recalled, "The [corporation] counsel and HR then came to me and recommended that I discipline Mr. Pettygrue for I guess making a racial comment, calling people racists to the point they became very angry. I did as I was advised and disciplined Mr. Pettygrue to which he took offense and filed a complaint." (Seidelman Dep. at 17.)

Pettygrue in fact filed a charge with the Equal Employment Opportunity Commission. (*See* Pl.'s Resp. to County's Mot. Ex. 4, May 23, 2012 EEOC Determination Letter.) It appears that in the charge (no one has provided a copy to the Court), Pettygrue asserted that Macomb County had discriminated against him because he was African-American and retaliated against him because he had participated in an EEOC investigation. (*See id.*)

In November 2011, the EEOC investigated Pettygrue's charge. The Commission interviewed Amthor, Acre, and Seidelman (among others), with Amthor identified as one of Pettygrue's witnesses. (Amthor Dep. at 34–35; Seidelman Dep. at 15; Acre Dep. at 21.) During his November 17 interview, Amthor mentioned Seidelman's discipline of employees at the Center. (Amthor Dep. at 37.) As for Acre, Amthor recalled that the gift-card incident was "briefly brought up." (Amthor Dep. at 92.) Amthor could not recall much else of what he told the EEOC:

> A. I remember [the EEOC investigator] asking me if I ever saw Mr. Pettygrue in any way be racist towards anyone.
>
> Q. And your answer was?
>
> A. No. definitely no. And then I think she asked me about how discipline [of employees] was handled there. . . . And that's really about all I can remember. I mean, I know she asked me a lot more, but, you know, that's been awhile.

(Amthor Dep. at 36.) Amthor never conveyed what he told the EEOC to Seidelman, Acre, or anyone else. (Amthor Dep. at 38–39; *see also* Acre Dep. at 22; Seidelman Dep. at 20.)

In May 2012, the EEOC issued a "Determination" letter regarding Pettygrue's charge: "The investigation revealed that there is reasonable cause to believe that Charging Party's allegations are true." (Pl.'s Resp. to County's Mot. Ex. 4, May 23, 2012 EEOC Determination Letter.) The EEOC was unsuccessful at conciliation. (Pl's Resp. to County's Mot. Ex. 5, Pettygrue Right to Sue Letter.) So it issued Pettygrue a right-to-sue letter. (*Id.*) Acre recalled,

"[Pettygrue] was showing it around the building. He showed it to me. It was recommended [by the EEOC] that he receive a set amount of money [from the County]. I don't remember if it was $25,000 or $30,000." (Acre Dep. at 20.)

### C.

Amthor maintains that soon after his November 2011 EEOC testimony, Seidelman, and later Acre, began to retaliate against him. (Pl.'s Resp. to County's Mot. at 4–5.)

According to Amthor, the first incident occurred about two weeks after his testimony, on or around November 29, 2011. (Amthor Dep. at 41; *see also* Seidelman Dep. at 21.) Amthor recalled, "I had a lunch that I had brought from home and I was eating it in the cafeteria. And [Seidelman] came up and started yelling at me and telling me to take my food in the back. And I kind of looked at him dumbfounded like why, because everybody did it, like everybody eats food around the kids." (Amthor Dep. at 41; *see also* Seidelman Dep. at 21.) Seidelman also directed a supervisor to reprimand Amthor. (Seidelman Dep. at 22; Amthor Dep. at 45–46.) Amthor could not recall grieving the reprimand to the Local Union, explaining:

> I just—I think I was kind of shocked more than anything, and he told the supervisor to write me up, which was kind of weird, like it's kind of below Mr. Seidelman to go out of his way to have a worker reprimanded like that. Usually a supervisor would do that. So like he took it to the supervisor and was like, "Hey, make sure this guy gets a reprimand." And, you know, it was right after I gave testimony for the EEOC investigation for Mr. Pettygrue that that happened.

(Amthor Dep. at 46.)

Amthor also recalled that others who had not testified to the EEOC or lied to the EEOC were permitted to eat their own food in the cafeteria:

> A. Well, what I felt was the fact that the other people that were involved with [the EEOC] investigation that didn't testify . . . or maybe lied were not reprimanded for bringing food in, but—

7

Q. Do you know if they brought food into the cafeteria . . . . at this point in time in November of 2011?

A. Yes.

Q. Who?

A. Mike Walsh was one of them.

Q. Is it your opinion that Mike Walsh will testify under oath that in November of 2011 he brought his own food into the JJC cafeteria?

A. I have no way of knowing that.

Q. Who else?

A. I can't recall.

(Amthor Dep. at 46–47.)

It is undisputed that Amthor violated the Center's policy by eating his own food in the cafeteria. (*See* Amthor Dep. at 45, 48, 90.)

## D.

Amthor says he was next retaliated against in January 2012, about two months after his EEOC testimony.

On January 17, Seidelman sent Amthor the following e-mail: "Please be advised, effective on or about 2/18/2012 your shift assignment is being changed to midnights." (Dkt. 35, Pl.'s Resp. to County's Mot. Ex. 8, Jan. 17, 2012 Email from Seidelman to Amthor.) Amthor responded by making his case to stay on the day shift:

> Dear Mr. Seidelman, with all due respect sir, I love working with these kids, this is w[h]ere my heart is. My 8 years of service here have been spent working with the youth everyday. This move would give me no time working with them. In addition, this change to my family life at this time would be greatly detrimental. I am asking for you to show me some mercy and please reconsider this move. I understand that one of the new full time hires would like to work midnights, however, he could not apply for the position at that time.

8

Sincerely, Scott Amthor

(Pl.'s Resp. to County's Mot. Ex. 8, Jan. 23, 2012 Email from Amthor to Seidelman.) Seidelman

never responded to Amthor's email. (Amthor Dep. at 53.)

At his deposition, Seidelman explained that he moved Amthor to the night shift because

Amthor "spent little time outside of the office directly relating to kids":

> It was my observation over the time that I supervised that Mr. Amthor did little in
> developing youth and making positive relationships and my exit interviews of
> youth when they left of who made a difference with kids, I don't recall Mr.
> Amthor being listed as a positive influence of the kids leaving. I really—Mr.
> Amthor, I thought, if he was going to serve the [C]ounty in the youth home, he
> could do—he could serve the [C]ounty best by being on midnights and making
> sure the kids were safe and in their rooms, being appropriate, I thought that was
> the best place to use somebody of his skill.

(Seidelman Dep. at 34–35.) When asked if these performance-related issues were reflected in

Amthor's personnel file, Seidelman was equivocal: "There were write-ups in Mr. Amthor's file

and I removed stuff from Mr. Amthor's file. There are issues in Mr. Amthor's file . . . . I don't

know if there are items in his file regarding [his performance]." (Seidelman Dep. at 35–37.) It

appears that Amthor's performance reviews were not produced during discovery in this case.

(*See* Pl.'s Resp. to County's Mot. at 18.)

Regarding Amthor's suggestion that a new hire be placed on the night shift, Seidelman

explained that was not a good idea because "over my years of experience I've learned that . . .

whenever possible you don't start new employees on the midnight shift. You start new

employees on shifts where they work with kids, with youth. You can find out do they have a skill

set that's appropriate to work with you or not." (Seidelman Dep. at 53.)

Amthor recounted receiving a different explanation for being moved to nights from Mark

Emerick, an assistant director at the Center:

9

> [Emerick] said, "Well, you're being moved because of positional seniority." And
> I said, "Well, what does that mean?" And he stated, "You're the last one to move
> to days." And I was like, "Mark, that doesn't make sense, like we've never done
> that before in the past." And he was just kind of quick to get off the phone.

(Amthor Dep. at 76.)

Amthor also recalled that another Center employee, Listenbee, had written a statement on
behalf of Pettygrue, but then stated that he had not written the statement. (Amthor Dep. at 66.)
According to Amthor, Listenbee "was later rewarded my day shift." (Amthor Dep. at 65; *see also
id.* at 66.) Amthor further testified, "I don't think there was a vacancy [on the night shift at that
time]. I think [Seidelman] just moved me." (Amthor Dep. at 80.)

**E.**

Amthor complained of his transfer to the night shift in three ways.

One involved the Local Union. Amthor contacted Acre (as Local Union president) and,
on January 19, 2012, filed a grievance. (Acre Dep. at 28; Amthor Dep. at 84; Dkt. 34, Union's
Mot. Summ. J. Ex. 2, Jan. 19, 2012 Grievance Resp.) Acre testified that although the Local
Union believed that Seidelman had not violated the collective bargaining agreement between
Macomb County and POAM by moving Amthor to nights, they nonetheless filed a grievance
"[m]ostly because we didn't get any information as to why [Mr. Amthor] was selected and . . .
because he felt he was retaliated[.]" (Acre Dep. at 67–68.) Amthor testified that the union had
successfully pursued a grievance in a similar situation four or five years earlier: "the union has
fought that before and people have gotten their day shift back because they were moved for
quote discipline reasons and stuff." (Amthor Dep. at 82.)

Acre explained that the grievance process had four steps: step one involved the grievant's
supervisor; step two involved the Center's director; step three, the County's human resources

10

department; and step four, arbitration. (Acre Dep. at 10–11; *see also* Bathanti Dep. at 7.) At step

two, Seidelman denied the grievance, writing on the response form, "no contract violation." (Jan.

19, 2012 Grievance Resp.) It is not clear from the record if this grievance was pursued to step

three. Acre recalled, "I believe we went to step 3 on this" (Acre Dep. at 34), but, speaking about

his grievances more generally, Amthor testified, "I would say that grievances were filed. I

wouldn't say they were pursued how they normally would have been pursued" (Amthor Dep. at

97; *see also* McMahon Dep. at 15 (providing that he did not recall involvement in a step three

grievance)).

The second route Amthor used to challenge his transfer involved Macomb County's

Human Resources Department. In February 2012, Amthor emailed Defendant Karen Bathanti, a

human resources director for the County. (*See* Bathanti Dep. at 6, 12.) Although the contents of

the emails are not part of the record, the County has provided the Court with a copy of an

undated complaint Amthor submitted to human resources. (Macomb's Reply Ex. F.) Amthor's

complaint asserted that the reason he was provided for his transfer to the night shift was "not

true":

> When I asked the assistant director Mr. Mark Emerick why I was being moved he
> told me it was because I was the last staff that moved to day shift. This was not
> true because two other staff with less seniority than me moved to day shift on 1-8-
> 201[2].[1] I would also like to point out, that in all my years of service at the
> Juvenile Justice Center, my highest grade on all my performance reviews are for
> my ability to work well with the residents.

(Macomb's Reply Ex. F.) Amthor recalled Bathanti taking no action: "when I made a formal

complaint with Human Resources and gave her some names of people that were witnesses, she

---

[1] It appears that the dates in Amthor's letter are off by one year and that references to
2011 were meant to be to 2012.

said she was [going to] do an investigation. She never even talked to those people." (Amthor Dep. at 65.)

Bathanti testified differently. She said she interviewed Seidelman and Emerick. (*See* Bathanti Dep. 13, 21.) According to Bathanti, both Seidelman and Emerick informed her that, under the collective bargaining agreement between the County and the Local Union, Seidelman had discretion to move Amthor to the night shift. (Bathanti Dep. at 13–14). Bathanti agreed with their interpretation. (Bathanti Dep. at 13, 19.)

The third complaint route involved the EEOC. Amthor's February 7, 2012 charge states, in part:

> On 17 November 2011, I was a witness in a Federal EEOC Investigation[,] . . . since this date I have experienced animosity from my Director. On or about 29 November 2011, I was verbally reprimanded for an incident that similarly situated co-workers who have not participated in a protected activity are ever reprimanded for. On 17 January 2012, I was informed that I would be moved from my day shift to the midnight shift, I was not given any further explanation as to why this would be occurring.
>
> I can only conclude that I have been subjected to different terms and conditions of employment in retaliation for having participated in a protected activity . . . .

(Union's Mot. Summ. J. Ex. 7, Amthor EEOC Charge.)

## F.

Amthor implies that Seidelman continued to retaliate by keeping him on the night-shift despite day-shift openings in October and November 2012. (*See* Pl.'s Resp. to County's Mot. at 7–8.)

In October 2012, it was determined that two day-shift, group-facilitator positions held by Dale Harmon and Dave Whitsak were no longer necessary. (*See* Seidelman Dep. at 45.) Initially, Seidelman thought that the two day-shift openings should be posted. So at noon on October 12,

2012, Seidelman emailed the Youth Specialists: "There is a opening on days for two full time male youth specialist. If interested in changing shifts please email me before 10/19 with 'shift change' in the subject line." (Pl.'s Resp. to County's Mot. Ex. 10, 1st Oct. 12, 2012 Email from Seidelman.) While the timing is not clear, Amthor did express interest in the two openings. (*See* Amthor Dep. at 55.)

Not long after Seidelman sent this email, Harmon and Whitsak spoke with Acre, with Acre agreeing to speak to Seidelman about the situation. (*See* Amthor Dep. at 55; Acre Dep. at 37.) Acre recalled explaining the Local Union's position about the openings this way:

> I told [Seidelman] whatever he decides, it doesn't matter, we're going to be filing a grievance either way. If you move those two off the shift, they were already moved to days, we didn't recognize [the group facilitator position] as a temporary position, they have a grievance to file. If he leaves them on the shift, somebody else is going to want to file a grievance, we're going to have to file a grievance on [Seidelman] for not doing the contract.

(Acre Dep. at 38.) Acre further recalled, "Truthfully, the reasoning for that was simply so we could get down to human resources and have the POAM come in and pretty much assist making the decision." (*Id.*)

Seidelman testified that he had second thoughts about posting the two day-shift openings even before his conversation with Acre:

> I remember sitting at my desk and seeing the e-mail and saying this just isn't right so I stopped and I met with . . . Acre . . . and I discussed the matter with him and re[-]reviewed the contract and we came to the conclusion or agreement that those two staff were the senior-most people that would have applied if it had been a full-time opening on day shift. We had the ability to leave them on day shift. We would have two people for the last year had worked day shift after taking assignment, would have to be displaced or moved back and I made the decision with the union's support that they could be left on that shift and it would be doing right to the employees, to the [C]ounty, to the youth.

(Seidelman Dep. at 46.)

Whether due to Acre's urging or completely by his own volition, at about 3:00 p.m. on the same day, October 12, Seidelman retracted his request for applicants and awarded the day-shift positions to Harmon and Whitsak:

> I apologize for sending out the earlier email regarding the first shift openings. There will not be any day shift openings to be filled at this time.
>
> When Dale [Harmon] and Dave [Whitsak] came to day shift as [group] facilitators they were the most senior youth specialists not on day shift that expressed an interest to move to days. It would only be fair to leave them on days and not post their opening. I believe this fills the contract expectations and is the right thing to do given the situations.

(Pl.'s Resp. to County's Mot. Ex. 10, 2d Oct. 12, 2012 Email from Seidelman.)

Amthor testified that as temporary employees and consistent with past practice, Harmon and Whitsak "should have moved back to their afternoon[] [shifts]." (Amthor Dep. at 70.) Amthor filed a second grievance with the Local Union. (Amthor Dep. at 55.)

In November 2012, there was another day-shift opening due to a Youth Specialist, Chris Alston, leaving the Center for Macomb County's juvenile court. Amthor again expressed interest in the opening, but Seidelman again denied Amthor the position. (*See* Amthor Dep. at 56–57.)[2]

Amthor attempted to grieve Seidelman's denial with the Local Union because he believed that Alston's move contractually required Seidelman to give the spot to the most senior employee, in this case, Amthor. (*See* Amthor Dep. at 57.) Amthor recalled, "I think I talked to Mr. Acre about filing a grievance, and he actually said I couldn't because [Alston] wasn't moved, he was quote promoted, which is the first time in the whole history of the place they've ever called it a promotion." (Amthor Dep. at 57; *see also id.* at 86.) Amthor explained that on

---

[2] Although it does not appear to relate to this particular opening, Amthor testified that another employee, Greg Pennabacker, told him that Seidelman had solicited Pennabacker for a day-shift position even though Pennabacker had not applied for the position. (Amthor Dep. at 74; *see also* Macomb's Reply Ex. F, Undated Amthor Letter.)

another occasion when an employee became a "Sheriff's Deputy next door[,] [i]t was never called a promotion." (Amthor Dep. at 58.) The characterization matters, testified Amthor, because "in our contract when . . . there's . . . a vacant position, . . . it's supposed to be filled based on seniority. And I was the highest in seniority so I should have been put back on the day shift, but because Seidelman was calling it quote a promotion, . . . he was saying that he could fill it in a different way. And the union was saying the same thing." (Amthor Dep. at 58.)

It appears that Amthor refers to Article 17 of the collective bargaining agreement between the County and POAM, which provides in part, "Selection of employees for a shift vacated by a retirement, resignation or termination shall be given to the highest seniority employee that applied." (County's Mot. Ex. C, CBA Article 17.)

Acre testified that the collective bargaining agreement would not have defined Alston's move as "anything" because the juvenile court was "outside of our union." (Acre Dep. at 39.) Not inconsistent with Acre's testimony, Article 18 of the collective bargaining agreement provides, "[a] promotion is the movement of an employee to a higher paid position" without saying whether "higher paid position[s]" are only those at the Center. (CBA Article 18.) Acre added that the County classified the move as a promotion, that Alston's new position was "better" and "higher paying," and that "[w]e work for Macomb County, not only [the Center]." (Acre Dep. at 39–40.) Acre recalled that he had discussed a potential grievance with POAM and "[t]he decision was made because the contract is very clear that the position has to be open through resignation, retirement, and termination." (Acre Dep. at 44.) Acre also recalled that there had already been a grievance filed on Amthor's behalf relating to the October 2012 openings "and we were waiting on a step 3 meeting around that time frame." (Acre Dep. at 44.)

## G.

The step-three appeal took place in November 2012 or July 2013. (Defendants say the former date (Answer ¶ 63), Plaintiff the latter (Compl. ¶ 63), but neither supports their claim with evidence.) In attendance were Seidelman and Bathanti for the County, Amthor as grievant, Acre as president of the Local Union, and, Defendant James McMahon, a "Business Agent" for POAM. (Mahon Dep. at 7, 9–10, 17.) At his deposition, McMahon recalled that he thought that Amthor's transfer to the night shift was not a grievable issue, but "since it was in front of me[,] I thought we would try to do the best for Scott." (McMahon Dep. at 20.)

According to Acre, at the meeting, Seidelman took the position that "under the contract he had the right to pick whoever he wanted in the bottom 75 percent." (Acre Dep. 45.) "[T]he bottom 75 percent" apparently also refers to the following portion of Article 17 of the collective bargaining agreement:

> If there is no interest expressed by any employees for the shift opening and the position will be filed with current employees, then the opening shall be filled at the Director's discretion from employees in the bottom 75% of the seniority list. Such selections by the Director shall not be subject to the Grievance Procedure.

(CBA Article 17.) Although the record does not make clear whether it was at this meeting or a subsequent one, both Acre and McMahon testified that Seidelman also discussed how Amthor did not perform well with the youth at the Center. (McMahon Dep. at 25; Acre Dep. at 46.) McMahon recalled, "Seidelman said off the record . . . [that] Scott Amthor does not get along well with other people and we take care of children here and I think it's probably best for the children if he is on midnights and the contract allows me to do it." (McMahon Dep. at 25.)

During a break in the step-three grievance meeting, Amthor told Acre and McMahon that he was willing to settle: he would drop his EEOC charge and his grievances if the County agreed to put him back on the day shift. (McMahon Dep. at 21–22; Acre Dep. at 47–48.) McMahon then

16

immediately proceeded to meet with Seidelman and Bathanti (outside of Amthor's presence) to discuss this offer. (McMahon Dep. at 22–23; Acre Dep. at 47–48; Amthor Dep. at 60–61.) McMahon recalled that Bathanti said, "I'll tell you what, Jim, I'll contact the county attorney and I'll get their opinion." (McMahon Dep. at 23.) Amthor recalled that when McMahon returned, "They didn't say anything really. They just said that he's [Seidelman is] not [going to] budge." (Amthor Dep. at 61.)

McMahon and Acre decided to "table" the grievance. (McMahon Dep. at 28; Acre Dep. at 48.) McMahon recalled, "I was hoping that I would get a favorable answer from Karen Bathanti, that legal counsel would tell her it's a good resolution, and also that I believe it was at that time or subsequently, maybe shortly thereafter, that I found out Mr. Seidelman was going to retire, which I was hopeful that with his retirement we could do both, solve Scott's grievance and change Article 17." (McMahon Dep. at 41.) Acre recalled, "[W]e asked the county to table the grievance which means it was put on hold pending the resolution of the EEOC complaint simply because the county refused to speak because of legal involvement at that point. They wouldn't discuss it anymore." (Acre Dep. at 48–49.)

## H.

In February 2013, the EEOC issued a "Determination" letter on Amthor's February 2012 charge. (Dkt. 1, Compl. Ex. C.) The letter informed: "The investigation revealed that there is reasonable cause to believe that Charging Party's allegations are true." (*Id.*) In July 2013, following a failed attempt at conciliation, the EEOC issued Amthor a "Notice of Right to Sue Within 90 Days." (Pl.'s Resp. to County's Mot. at 35.)

17

## I.

In August or September 2013, Seidelman retired. (Seidelman Dep. at 7–8; Acre Dep. at 51.) POAM was successful in negotiating with the Center's new director, Rhonda Westphal, to amend Article 17 "to change our language from the 75/25 split that we had to all positions go by seniority." (Acre Dep. at 52; *see also* McMahon Dep. at 29, 31, 38.) POAM was also successful in working with Westphal to resolve an outstanding grievance by another employee, Tim Martin, who, like Amthor, wanted to be on days but had been placed on nights. (McMahon Dep. at 31; Acre Dep. at 52.) The same resolution was offered to Amthor, but Amthor refused it as it would have precluded this lawsuit. (*See* McMahon Dep. at 31; Acre Dep. at 51–52.)

## J.

In September 2013, Amthor filed suit. (Dkt. 1.) Amthor's Complaint sets forth two counts. In Count I, he asserts that Defendants "violated the anti-retaliation provision of Title VII by reprimanding Amthor without justification, transferring him to the midnight shift, refusing to return him to an open or vacant position on the day shift, and refusing to properly represent him or address his union grievances, in retaliation for his participation and testimony given in the Pettygrue EEOC Investigation." (Compl. ¶ 72.) Count II makes essentially the same factual allegations, but says that they amount to a violation of Michigan's Elliott-Larsen Civil Rights Act. (Compl. ¶ 79.)

In December 2014, all Defendants moved for summary judgment on all claims. (Dkts. 33, 34.)

## II.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.

Defendants County of Macomb, Seidelman, and Bathanti have moved separately from Defendants Macomb County Juvenile Justice Association, the Police Officers Association of Michigan, Acre, and McMahon. The Court will consider the County Defendants' motion first (taking Title VII before Michigan's analog), and then turn to the Union Defendants' motion.

## A.

Title VII makes it unlawful for an employer to discriminate against one of its employees because the employee "made a charge, testified, assisted, or participated in any manner in an" EEOC investigation. *See* 42 U.S.C. § 2000e-3(a). A retaliation claim may be established by either direct or circumstantial evidence. *Weeks v. Michigan, Dep't of Cmty. Health*, 587 F. App'x 850, 858 (6th Cir. 2014). Amthor has pursued the circumstantial route. (*See* Pl.'s Resp. to Union's Mot. at 11–12; Pl.'s Resp. to County's Mot. at 10–11.)

The familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981), thus applies to Amthor's claim against Seidelman. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009). Amthor must first establish a *prima facie* case of retaliation by showing that "(1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment

19

action." *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 880 (6th Cir. 2013) (internal quotation marks omitted). If he succeeds, the County Defendants must come back with a non-retaliatory reason for its employment action. *See id.* And, if the County Defendants do that, Amthor avoids summary judgment if he can show that the County's proffered reason is a pretext for retaliation. *See id.*

## 1.

The County Defendants argue that Amthor cannot establish a *prima facie* case of retaliation because Seidelman's conduct was not "adverse" as a matter of law. They stress that none of Seidelman's yelling at Amthor, the subsequent reprimand, and the move to night shift affected Amthor's pay, title, or benefits. (County's Mot. at 11–14.) The Court mostly disagrees with the County Defendants' adverse-action argument.

To start, the Court disagrees with the legal standard upon which the County Defendants rely. Quoting from *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998), they assert: "To constitute an 'adverse employment action,' the action must involve 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" (County's Mot. at 13.) But, as the Supreme Court has pointed out, *Ellerth* was not a retaliation case. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 65 (2006) ("*Ellerth* did not mention Title VII's antiretaliation provision at all."). And the Sixth Circuit has told us that "[u]nlike a Title VII discrimination claim, the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (internal quotation marks omitted).

20

Instead of the standard that the County Defendants proffer, Amthor must demonstrate that Seidelman's actions were "materially adverse," i.e., he must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 68 (internal quotation marks omitted).

With the standard settled, the Court turns first to Seidelman's yelling at Amthor for violating the Center's food policy and the associated verbal reprimand. This was not materially adverse. Amthor has not argued, let alone evidenced, that a verbal reprimand in any way affected his employment or did anything more than hurt his feelings. It appears that Amthor did not file a grievance about the reprimand. (Amthor Dep. at 48.) And it is undisputed that Amthor violated the policy. In all, the Court cannot say that a reasonable jury would think that Seidelman's yelling and the verbal reprimand would have dissuaded a reasonable Youth Specialist from supporting a charge of discrimination. *Cf. Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (reasoning, in the context of a retaliation claim, that "markedly lower performance-evaluation scores *that significantly impact an employee's wages or professional advancement* are . . . materially adverse" (emphasis added)); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) (providing, albeit in the context of a discrimination claim, "[w]ritten reprimands without any changes in the terms or conditions of . . . employment are not adverse employment actions"); *Wedyke v. Potter*, No. 06-14874, 2008 WL 2705501, at *7 (E.D. Mich. July 10, 2008) (providing, albeit in the context of a discrimination claim, "[d]isciplinary actions such as letters of warning and oral and written reprimands do not normally rise to the level of adverse employment actions without some tangible job consequences").

But the Court does not reach the same conclusion regarding Seidelman's assignment of Amthor to the night shift. The County Defendants make much of how, given his wife's work

schedule, the night shift permitted Amthor to spend more time with his wife and children than the afternoon shift. (County's Mot. at 4.) This might be true. (*See id.*) But the apt comparison is with the day shift. And, on that point, the County Defendants do not have much argument.

The record, however, says that Amthor and other Youth Specialists preferred the day shift. (*See* Jan. 23, 2012 Email from Amthor to Seidelman; Amthor Dep. at 14, 55–57.) Indeed, given the eleven applicants for the day-shift opening when Seidelman moved Amthor to that position in September 2011 (*see* Macomb's Reply at 2), coupled with the County Defendants' unsupported assertion (more on that below) that there was no interest in the night shift when Seidelman decided to move Amthor there in January 2012 (County's Mot. at 7–8), a reasonable jury could infer that the day shift was much more coveted than the night shift.

The County Defendants also argue that Amthor's move to the night shift cannot be considered adverse based on the fact that Amthor received limited mental-health treatment and marriage counseling, and that neither started until over a year after his move to the night shift. (Macomb Defs.' Mot. at 11–12.) The Court finds little merit in this argument. First, the County Defendants cite no authority that an adverse action for purposes of a Title VII retaliation claim must cause an employee to seek mental-health treatment. Second, there could be any number of reasons for Amthor's delay in treatment, including that Amthor was attempting to return to the day shift and that he tolerated the strain of the night shift for a time. Third, even if a jury deemed six weeks of marriage counseling and several sessions with a psychiatrist limited, Amthor's testimony indicates that a primary, if not the primary, reason for seeking treatment was the strain of the night shift. (Amthor Dep. at 19–20; *see also id.* at 13–14, 16–17, 19–20.) While it might impact damages, the Court is simply unconvinced that the timing and amount of mental-health treatment and marriage counseling would preclude a reasonable jury from finding that Amthor's

22

move to the night shift was adverse. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 392 (6th Cir. 2010) (finding, despite that the plaintiff's failure to "describe in detail how the schedule change affected her," that the plaintiff's allegation that "she 'wasn't happy' about transferring to nights because she was a single mother" supported a finding that the schedule change was an "adverse" action for purposes of a retaliation claim); *cf. White*, 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.").

Moreover, aside from Amthor's home life, Amthor holds a degree in social work, earned that degree so he could help people like the youth at the Center, and specifically told Seidelman that he enjoyed working with children once informed of his placement on the night shift. (Amthor Dep. at 52; Jan. 23, 2012 Email from Amthor to Seidelman.) A reasonable jury could readily infer that there is more interaction with the youth at the Center during the day—indeed, McMahon inferred as much (McMahon Dep. at 26), and, according to Seidelman, the very reason for moving Amthor to the night shift was to reduce his interaction with the youth at the Center (Seidelman Dep. at 34–35).

In all, the Court concludes that even if Amthor's pay, title, and benefits were not adversely affected by the transfer to the night shift, a reasonable jury could find that being moved from the day shift to the night shift at the Center would dissuade a reasonable Youth Specialist from engaging in conduct that Title VII protects. *See Spees v. James Marine, Inc.*, 617 F.3d 380, 392 (6th Cir. 2010) ("An inconvenience resulting from a less favorable schedule can render an employment action 'adverse' even if the employee's responsibilities and wages are left unchanged." (internal quotation marks omitted)).

**2.**

The County Defendants also argue that Amthor cannot make out a prima facie case of retaliation under Title VII because he has insufficient evidence of causation. The Court again only agrees in part.

Under *University of Texas Southwest Medical Center v. Nassar*, --- U.S. ---, 133 S. Ct. 2517, 2533–34, 186 L. Ed. 2d 503 (2013), Amthor must do more than show that a reasonable jury could find his EEOC testimony "a motivating factor" for Seidelman's decision to move him to the night shift. Amthor must instead prove that his testimony was "a but-for cause" for the move. *Nassar*, 133 S. Ct. at 2533–34. But this is summary judgment, so, for now, Amthor only need show that a reasonable jury could find that Seidelman would not have moved him to the night shift had he not given testimony to the EEOC. *See Weeks v. Michigan, Dep't of Cmty. Health*, 587 F. App'x 850, 859 (6th Cir. 2014) (asking whether a "reasonable jury could believe" that "but for" the plaintiff's protected activity, the plaintiff would have been selected for the position).

Amthor has carried this burden. This is not to say that the County Defendants have not made strong arguments. For one, it is undisputed that Seidelman did not know the content of Amthor's EEOC testimony. (Amthor Dep. at 37–38; *see also* Acre Dep. at 22; Seidelman Dep. at 20.) Thus, it is possible that Seidelman thought that Amthor testified in his favor. And, if Seidelman thought that, he, of course, would have had no reason to retaliate. Amthor's rebuttal, that he was listed as one of Pettygrue's witnesses, does not eliminate this possibility: Amthor has presented no evidence that Seidelman knew this fact. (*See* Pl.'s Resp. to County's Mot. at 15–16 (stating only that Seidelman knew that Amthor was participating in the EEOC investigation, but not that Seidelman knew that Amthor was testifying on Pettygrue's behalf).) Second, the County

24

Defendants are correct to question the inference Amthor draws based on Seidelman's decision to transfer Amthor to the night shift just four months after moving him to the day shift. In particular, Defendants have shown that Seidelman did not select Amthor for the day shift in September 2011, but was required to give Amthor that opening under the collective bargaining agreement. (Macomb's Reply at 1.) So it does not appear that, as Amthor claims, Seidelman "suddenly and inexplicably" changed his mind as to the shift that Amthor should work. (Amthor's Resp. at 18.)

The County Defendants' arguments notwithstanding, a reasonable jury could still find the requisite causal connection. *First*, because it was Seidelman's act of disciplining Pettygrue that triggered the EEOC investigation, a reasonable jury could infer that Seidelman may have been upset or, at least, concerned about the investigation, including what Amthor told the EEOC. And the County Defendants do not present any evidence that Seidelman thought Amthor testified in his favor.

*Second*, although itself not an adverse action, Seidelman's interim act of yelling at Amthor and ordering a reprimand helps bridge the gap between Amthor's testimony and his move to the night shift. Of course, mere temporal proximity between protected conduct and alleged retaliatory action establishes a causal connection only when the time lapse is very short, *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497, 505–06 (6th Cir. 2014), but here a reasonable jury could couple timing with disparate treatment. Although somewhat equivocal, Amthor testified that "other people [who] were involved with [the EEOC] investigation that didn't testify[,] . . . or maybe lied[,] were not reprimanded for bringing food" into the cafeteria. (Amthor Dep. at 47.) And Amthor specifically named "Mike Walsh" as an example. (*Id.*) So a

jury could find that Seidelman yelled at Amthor and ordered a reprimand because of Amthor's EEOC testimony.

*Third*, Amthor's placement on the night shift was itself not long after his testimony—just two months. *See E.E.O.C. v. Ford Motor Co.*, --- F.3d. ---, No. 12-2484, 2015 WL 1600305, at *11 (6th Cir. Apr. 10, 2015) (en banc) ("The mere four months between Harris's charge and her discharge seems suspicious."). And Amthor testified, albeit again equivocally, that this too involved disparate treatment: "I believe that Mr. Listenbee wrote a statement on Mr. Pettygrue's behalf and then recanted that, and then Mr. Listenbee was later rewarded my day shift." (Amthor Dep. at 65–66.)

*Fourth*, as alluded to above, although Bathanti's, Acre's, and McMahon's testimony suggests that there was night-shift vacancy (Acre Dep. at 45, 67–68; Bathanti Dep. at 13–14, 19; McMahon Dep. at 25), the County Defendants have not placed the issue beyond doubt by producing documents evidencing a vacancy (*see* County's Mot. at 7–8). And Amthor avers there was no such vacancy. (Amthor Dep. at 80–81.) This genuine dispute is material because, if there was no vacancy, a jury would rightly wonder why Seidelman decided to move Amthor to the night shift when he did.

*Fifth*, Amthor was provided with no clear reason for his move to the night shift. *See Cantrell v. Nissan North America Inc.*, 145 F. App'x 99, 107 n. 2 (6th Cir. 2005) ("The overlap between the causal connection requirement and a showing that the proffered reason for termination was not the actual reason is implicitly recognized in our case law, which permits both to be proven by the same type of evidence."). Seidelman never provided Amthor an explanation for his transfer. (*See* Amthor Dep. at 76.) And Seidelman's performance-based explanation during litigation—that Amthor "did little in developing youth and making positive

26

relationships" (Seidelman Dep. at 34–35)—is different from Emerick's "shift seniority" explanation. A jury could also find that Seidelman's ultimate explanation for the move was simply false: if Amthor had problems interacting with the youth at the Center, why did Seidelman permit Amthor to work the afternoon shift for seven years? And why, two months after his EEOC testimony, did Amthor's shortcomings finally warrant a move to the night shift? If a jury found Seidelman's explanation false, which it could, it could infer that the real reason was retaliation. *See* Cantrell, 145 F. App'x at 107 (6th Cir. 2005) ("We hold that the same circumstances which established a causal connection between Cantrell's protected activity and her termination also serve as sufficient evidence [of pretext].").

*Sixth*, a jury could find that Seidelman's subsequent conduct was consistent with a retaliatory motive. As noted, in October 2012, when there were two day-shift openings, Seidelman did not award Amthor one of the shifts. True, Seidelman did not single out Amthor by retracting a posting sent to all Youth Specialists for Harmon and Whitask's positions. And the Court acknowledges that Seidelman gave a plausible explanation for keeping those two on the day shift. But a jury could also credit Amthor's testimony that when a temporary position ended, employees would typically return to their prior shift, and, thus, Seidelman had made an exception to the general rule at a time when Amthor applied for a day-shift opening. (*See* Amthor Dep. at 70; Seidelman Dep. at 67.) As to the November 2012 opening, it is true that Alston moved to a better paying position within the County of Macomb, and  thus, his position was arguably not a vacancy under the collective bargaining agreement requiring Seidelman to fill Alston's spot with the most senior Youth Specialist, Amthor. But it is also true that neither Acre's testimony nor the collective bargaining agreement makes clear whether a move to a position outside of the Center was considered a "promotion" so as to avoid the agreement's

"vacancy" clause. Further, Amthor testified that on a prior occasion, when a Center employee had become a "Sheriff's Deputy next door," the move was not classified a promotion.

In sum, this Court's summary-judgment task is not to determine whether Amthor's EEOC testimony was a "but for" cause of Seidelman's decision to move Amthor to the night shift; it is enough that a reasonable jury could so find. Given the timing of when Seidelman moved Amthor to the night shift, Amthor's deposition testimony that others who did not testify as he did were treated differently, Seidelman's failure to tell Amthor the reason for the move when he sought one, and the conflicting reasons later given, the Court concludes that a reasonable jury could find that had Amthor not testified during the EEOC investigation, Seidelman would not have moved Amthor to the night shift.

### 3.

The County Defendants also appear to argue that Amthor cannot show that Seidelman's reasons for moving him to the night shift were pretextual. (Macomb Defs.' Mot. at 14–15.) To the extent that the County Defendants argument about pretext is not forfeited as too undeveloped, *see, e.g.*, *Get Back Up, Inc. v. City of Detroit*, No. 13-2722, 2015 WL 1089662, at *5 (6th Cir. Mar. 13, 2015), the Court finds it is completely conflated with causation and fails for the same reasons.

As explained, there is a genuine issue of material fact over whether there was a vacancy when Amthor was moved to the night shift in in January 2012. True, at the step-three grievance hearing, Seidelman's assertion that "under the contract he had the right to pick whoever he wanted in the bottom 75 percent" (Acre Dep. at 45) would indicate that Seidelman considered the night-shift position "vacated by a retirement, resignation or termination" under Article 17 of the collective bargaining agreement. But Amthor testified that there was no vacancy. (Amthor

Dep. at 80–81.) This is sufficient for a reasonable jury to question whether, as the Macomb Defendants assert in their brief, Seidelman in fact selected among those Youth Specialists in the bottom 75 percent of seniority. (County's Mot. at 7–8.)

But even if there was a vacancy giving Seidelman discretion under Article 17, Seidelman testified that he exercised that discretion by focusing on Amthor's poor interaction with the youth at the Center. (Seidelman Dep. at 34–35; McMahon Dep. at 25.) But the Court has already explained that a jury could readily doubt this explanation.

The Court also finds it troubling that Seidelman could not say whether Amthor's difficulties interacting with the youth were documented in Amthor's personnel file, that Seidelman had removed items from Amthor's file, and that the County Defendants have not produced Amthor's performance reviews in this litigation. (Seidelman Dep. at 35–37; Pl.'s Resp. to County's Mot. at 18.)

All said, the County Defendants' claim that Amthor cannot demonstrate pretext, to the extent that it is developed enough for consideration, does not warrant summary judgment in their favor.

## 4.

In addition to suing Seidelman, Amthor has sued Bathanti, the human resources director for Macomb County who had both received Amthor's formal complaint and participated in Amthor's step-three grievance meeting. Whatever the shortcomings in Bathanti's investigation into Amthor's formal complaint (*compare* Amthor Dep. at 65, *with* Bathanti Dep. at 13, 21), Amthor has not produced evidence permitting a jury to conclude that but for his EEOC testimony, Bathanti would have conducted it differently. Indeed, when asked about Bathanti at his deposition, Amthor had this to say:

Q. And who are you claiming—who by name are you claiming is responsible for retaliating against you?

A. Mr. Seidelman.

Q. Why is Ms. Bathanti named in this lawsuit; do you know?

A. Ms. Bathanti was named, because when I made a formal complaint with Human Resources and gave her some names of people that were witnesses, she said she was gonna do an investigation. She never even talked to those people. So I don't know how you can do investigation or say you did investigation when you didn't even talk to people.

Q. I understand. But you're not claiming that Ms. Bathanti retaliated against you because you talked to the EEOC; are you?

A. No.

(Amthor Dep. at 64–65.)

Thus, Bathanti is entitled to summary judgment in her favor on Amthor's Title VII retaliation claim.

### 5.

The County Defendants make no separate argument as to the County of Macomb. Apparently assuming that both Seidelman and Bathanti would be granted summary judgment, the County believed that it too would be granted that relief. (*See* County's Mot. at 13–17; *see also* Compl. ¶ 74 (asserting vicarious liability).) That assumption was incorrect and summary judgment in favor of the County will be denied.

* * *

To summarize the Title VII analysis as to the County Defendants, the Court finds that to the extent Count I of the Complaint asserts that Seidelman and the County of Macomb are liable under Title VII for retaliating against Amthor by transferring Amthor to the night shift (*see* Compl. ¶ 72), the County Defendants' motion for summary judgment on Count I will be denied.

30

**B.**

In Count II, Amthor asserts that the County Defendants are liable for retaliation under Michigan's Elliott-Larsen Civil Rights Act. The ELCRA provides, "Two or more persons shall not conspire to, or a person shall not . . . [r]etaliate or discriminate against a person . . . because the person has . . . testified, assisted, or participated in an investigation, proceeding, or hearing under this act[.]" Mich. Comp. Laws § 37.2701. The County Defendants' motion lumps together Title VII and Michigan's counterpart. (*See* County's Mot. at 13–17.) The legal analysis, however, is not the same under both statutes.

True, to establish a *prima facie* case of retaliation under the ELCRA, a plaintiff must show the same four elements required to establish a *prima facie* case of retaliation under Title VII: "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653 (Mich. 2005) (internal quotation marks omitted). But there are differences in how Michigan courts apply these elements under ELCRA and how federal courts do so under Title VII.

First, as explained, in *Burlington Northern*, the United States Supreme Court adopted a "materially adverse" standard for Title VII retaliation claims, i.e., a court asks whether the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (internal quotation marks omitted). But the County Defendants have not convinced this Court that this is the ELCRA standard. *See Haase v. IAV Auto. Eng'g, Inc.*, No. 298348, 2011 WL 6004073, at *5 (Mich. Ct. App. Dec. 1, 2011) (assuming, without deciding, that the *Burlington* standard was applicable); *Rott v. Madison Dist. Pub. Sch.*, No.

31

294291, 2010 WL 5175457, at *2 (Mich. Ct. App. Dec. 21, 2010) (concluding, but in dicta, "[w]e agree with the plaintiff that the decision in *Burlington* does broaden the definition of 'materially adverse action.' . . . Here, whether the change from counseling high school students to teaching elementary and middle school special education students is 'materially adverse' is a question for the jury."). Instead, it appears that Michigan courts applying the ELCRA continue to ask whether the action was "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Chen v. Wayne State Univ.*, 771 N.W.2d 820, 839 (Mich. Ct. App. 2009) (internal quotation marks omitted)).

Second, in *Nassar*, the United States Supreme Court provided that to establish causation, a plaintiff must show that "but for" his protected conduct, the employer would not have retaliated. 133 S. Ct. at 2533–34. But post *Nassar*, Michigan courts have continued to ask whether the protected conduct was a "significant factor" leading to the alleged adverse action. *See Thompson v. Dep't of Corr.*, No. 319668, 2015 WL 1261539, at *5 (Mich. Ct. App. Mar. 19, 2015) (citing *Nassar* with approval but nonetheless reciting significant-factor standard); *Konieczki v. City of Jackson*, No. 316097, 2014 WL 6467191, at *4 (Mich. Ct. App. Nov. 18, 2014) ("To establish causation, the plaintiff must show that his or her participation in protected activity was a significant factor in motivating the employer's adverse employment action, not just that there was a causal link between the two."); *Wrobbel v. Hydaker-Wheatlake Co.*, No. 305535, 2014 WL 310198, at *3 (Mich. Ct. App. Jan. 28, 2014) ("To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a significant factor in the employer's adverse employment action . . . .").

32

Some case law, including from this District, indicates that there is a third difference between a claim of retaliation under the Elliott Larsen Civil Rights Act and Title VII. *See Brintley v. St. Mary Mercy Hosp.*, 904 F. Supp. 2d 699, 730 (E.D. Mich. 2012) ("Michigan's law regarding pretext law differs from federal law . . . in that it requires 'pretext plus.'"); *Greenfield v. Sears, Roebuck & Co.*, No. 04-71086, 2006 WL 508655, at *11 (E.D. Mich. Mar. 2, 2006) ("[O]ne court in the Eastern District of Michigan held that Michigan law differs from federal law, as there appears to be a 'pretext plus' requirement.").

It is true that under the ELCRA, "a plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual," but must also show "that it was a pretext for [unlawful] discrimination." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 522 (Mich. 2001). But it also is true that a three-judge plurality of the seven-justice Michigan Supreme Court "decline[d] to adopt" either of two extreme pretext standards, including one "requir[ing] plaintiffs to offer substantial evidence both that the employer's articulated reason was false and that the employer's true reason was discriminatory—i.e., a 'pretext-plus' standard." *Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64, 69 (Mich. 1997) (Brickley, J.). Instead, the plurality "favor[ed] an intermediate position":

> We would hold that when viewed in the light most favorable to the plaintiff, the evidence must create a material issue of fact on which reasonable minds could conclude that the employer's stated reason is a pretext for discrimination for summary judgment to be precluded. Thus, plaintiff will not *always* present a triable issue of fact merely by rebutting the employer's stated reason(s); "put differently, that there may be a triable question of *falsity* does not necessarily mean that there is a triable question of discrimination." Furthermore, we note that in accordance with nine other federal circuits, "evidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, [may be] sufficient to support (but not require) a finding of discrimination."

*Town*, 568 N.W.2d at 69 (Brickley, J.). And while a plurality opinion is not binding, a majority

of the Michigan Supreme Court subsequently agreed to "adhere" to the standard proposed by the

plurality in *Town*:

> In our earlier decision in this matter, and in *Town v. Michigan Bell Telephone Co.*,
> 455 Mich. 688, 568 N.W.2d 64 (1997), a majority of this Court adopted what is
> known as the "intermediate position" for determining the proper summary
> disposition standard for employment discrimination claims under Michigan's
> Civil Rights Act. *We adhere to this intermediate position today, as have the
> majority of federal circuit courts of appeal.* Under this position, disproof of an
> employer's articulated reason for an adverse employment decision defeats
> summary disposition only if such disproof also raises a triable issue that
> discriminatory animus was a motivating factor underlying the employer's adverse
> action. In other words, plaintiff must not merely raise a triable issue that the
> employer's proffered reason was pretextual, but that it was a pretext for age or sex
> discrimination.

*Lytle v. Malady*, 579 N.W.2d 906 at 915–16 (Mich. 1998) (emphasis added); *see also Lytle*, 579

N.W.2d at 920 (Mallett, C.J.) ("I am in agreement with . . . [Part] III(A) . . . of [Justice

Weaver's] opinion."). Moreover, *Hazle*, a unanimous Michigan Supreme Court decision, cited

both *Lytle* and *Town* with approval. *Hazle*, 464 Mich. at 465.

Thus, *Town*, *Lytle*, and *Hazle* collectively result in this standard: a plaintiff seeking to

reach a jury on a claim under the ELCRA must not only show that a reasonable jury could find

that the employer's asserted non-discriminatory reason for its action was false, but also that it

was a pretext for discrimination. *Hazle*, 464 Mich. at 465–66. In some cases, simply

demonstrating falsity will not be enough for a reasonable jury to find pretext for discrimination,

*see Town*, 568 N.W.2d at 69 (Brickley, J.); *Lytle*, 579 N.W.2d at 916 (Weaver, J.); *Lytle*, 579

N.W.2d at 920 (Mallett, J.), but in others, "evidence sufficient to discredit a defendant's

proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie

case, [may be] sufficient to support (but not require) a finding of discrimination," *Town*, 568

N.W.2d at 69 (Brickley, J.); *see also Lytle*, 579 N.W.2d at 916 (Weaver, J.); *Lytle*, 579 N.W.2d at 920 (Mallett, J.).

The foregoing derivation of the pretext standard under the ELCRA leads to this point: as far as this Court can tell, it is in accord with that of Title VII. In *Reeves v. Sanderson Plumbing Products, Inc.*, the United States Supreme Court explained,

> [In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) we held that the] ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." . . . In other words, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."
>
> In reaching this conclusion, however, we reasoned that it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . . [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.
>
> This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146–48 (2000) (internal citations omitted).[3] Thus, the Court perceives no significant difference in a plaintiff's burden in establishing pretext under Title VII and the ELCRA.

So the question becomes whether the two identified differences between a prima facie case of retaliation under Title VII and the ELCRA—the adverse action and causation elements—

---

[3] Although *Reeves* was an Age Discrimination in Employment Act case, its discussion of pretext was in the context of applying the *McDonnell Douglas* burden-shifting framework used in Title VII cases, the primary case in the above-quoted passage from *Reeves*, *St. Mary's Honor*, was a Title VII case, and the Sixth Circuit has applied the above language from *Reeves* in Title VII cases, *e.g.*, *Philbrick v. Holder*, 583 F. App'x 478, 482 (6th Cir. 2014); *Faison v. Mahoning Cnty. Sheriff's Dep't*, 139 F. App'x 708, 713 (6th Cir. 2005).

warrant a different outcome as to Amthor's ELCRA claim from the one reached above regarding his Title VII claim. The answer is "no."

Although Amthor may have a higher burden under the ELCRA than under Title VII to establish an adverse action, Amthor has met that burden. As noted, adverse actions for purposes of the ELCRA are those actions "akin to termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Chen*, 771 N.W.2d at 839 (internal quotation marks omitted). As explained, a reasonable jury could find that Youth Specialists coveted the day shift much more than the night shift, that the night shift position adversely affected Amthor's relationship with his family, and that the night-shift duties differed significantly from the day-shift duties—at least in terms of interaction with the youth at the Center. Given all of this, a reasonable jury could find that once moved to the night shift, Amthor had "significantly diminished material responsibilities" and that the disruption in Amthor's family life amounted to "other indices that might be unique to a particular situation." *See Chen*, 771 N.W.2d at 839.

As for causation, the Court has found that a reasonable jury could find that Amthor demonstrated but-for causation regarding the move to the night shift; *a fortiori* a jury could find for Amthor under ELCRA's more plaintiff-friendly significant-factor standard.

\* \* \*

In sum, the Court finds that to the extent Count II of the Complaint asserts that Seidelman and the County of Macomb are liable under the Elliott-Larsen Civil Rights Act for retaliating against Amthor by transferring Amthor to the night shift (*see* Compl. ¶ 79), the County Defendants' motion for summary judgment on Count II will be denied.

36

## IV.

The Union Defendants' summary-judgment motion will be addressed more expeditiously: the inquiry starts and ends with the causation element.

## A.

First, Amthor has not shown that Acre had a significant motivation to retaliate. Although Acre had a dispute with Pettygrue, Acre testified that he did not file a complaint against Pettygrue (he only complained of how the Center was handling the situation) and Seidelman disciplined Pettygrue, not Acre. True, this discipline triggered Pettygrue's EEOC charge, but Acre indicated that the charge was directed at the Center or Macomb County—not Acre or the Local Union. In particular, when Pettygrue approached Acre after being reprimanded by Seidelman, the Local Union filed a grievance on Pettygrue's behalf resulting in the reprimand being removed from Pettygrue's file. (Acre Dep. at 70.) According to Acre, it was after this that Pettygrue elected to file a charge with the EEOC: "[The reprimand] was completely removed. That was the end of it. [Pettygrue] later informed me that he was going to file an EEOC complaint because he didn't feel it was right they were going to go after them again. He wanted to prevent them from trying to do it later on was the impression I got." (Acre Dep. at 70.) "[T]hey," apparently, refers to the Center, Seidelman, or Macomb County—not Acre or the Local Union. Moreover, Acre testified that during the EEOC investigation, his testimony was "favorable" to Pettygrue. (Acre Dep. at 71.)

Amthor has no evidence to rebut any of this. To the contrary, Amthor's own testimony indicates that he believed that Acre held a "grudge" because of the gift-card situation. (Amthor Dep. at 94–95.) Of course, Amthor's investigation into the Local Union's purchase of gift-cards from Acre's children's school is not conduct that Title VII protects.

37

Acre's limited motivation to retaliate coupled with other facts surrounding Amthor's placement on the night shift, demonstrate that a jury could not find that a "significant factor" motivating Acre's allegedly retaliatory conduct was Amthor's protected conduct. First, as Amthor's union representative, Acre pursued a grievance for him regarding Seidelman's decision to move Amthor to the night shift in January 2012. Although Amthor faults Acre for not pursuing the associated grievance with vigor (*see* Pl.'s Resp. to Union's Mot. at 6–7), and the Local Union did not pursue that particular grievance to step three (*see* McMahon Dep. at 15–16), the record also shows that Acre filed the grievance *despite* the Local Union's determination that it lacked merit, (*see* Acre Dep. at 67–78 (providing that a grievance was filed "[m]ostly because we didn't get any information as to why [Mr. Amthor] was selected and . . . because he felt he was retaliated[.]")). As to Amthor's testimony that the Local Union had, four or five years earlier, been successful in fighting another Center employee's placement on the night shift for disciplinary reasons, Amthor has not produced evidence permitting a jury to find that situation similar to his. Moreover, Acre testified that the Local Union was not even entirely successful in that instance, "his took months and months and months. His was gone before we actually got a resolution for him to go back to day shift." (Acre Dep. at 68.) Regarding the October 2012 day-shift openings, Amthor seems to believe that Acre conspired with Seidelman to keep Amthor on the night shift. (Pl.'s Resp. to Union's Mot. at 7–8.) But the record shows that Seidelman was already questioning his decision to post the two openings before he spoke with Acre. (Seidelman Dep. at 46.) Further, nothing suggests that Amthor's interest in the position prompted Acre's discussion with Seidelman—to the contrary, Acre approached Seidelman at the prompting of the two former group-facilitators whose day-shift positions were in jeopardy. (Acre Dep. at 37–38.) Finally, as to the November 2012 opening and associated grievance, that grievance was pursued

38

to step three. Amthor faults Acre (and McMahon) for tabling the grievance after the step-three meeting (Pl.'s Resp. to Union's Mot. at 9–10), but offers nothing to impeach Acre and McMahon's testimony that they tabled the grievance because the County refused to negotiate further and because they thought they would have better success once Seidelman retired, (McMahon Dep. at 41; Acre Dep. at 48–49). And Acre and McMahon were ultimately successful in negotiation of a settlement offer that would have released Amthor from the night shift.

In all, Amthor has not produced evidence permitting a reasonable jury to find that his EEOC testimony was a "significant factor" in Acre's alleged retaliatory conduct. As such, Acre is entitled to summary judgment on Count II of Amthor's Complaint, asserting that Acre retaliated in violation of the Elliot-Larsen Civil Rights Act. Because, as discussed, the causation bar for retaliation claims under Title VII is higher than the ELCRA's, it follows that Acre is also entitled to summary judgment on Count I, Amthor's Title VII claim.

## B.

Amthor's retaliation claims against McMahon border on legally frivolous. As Amthor testified,

> Q. Okay. So you don't believe Mr. McMahon ever tried to retaliate against you in any way?
>
> A. No.
>
> Q. Okay. Why did you name him in the Complaint?
>
> A. Because he left the Step 3 grievance procedure and went outside and talked to, you know, Mr. Seidelman, Bathanti, and I felt like I should have been privy to that information, what they were talking about.
>
> Q. Okay. Is that the only reason why you named him in the Complaint?
>
> A. Yes.

(Amthor Dep. at 94.)

In apparent acknowledgement of the absence of any evidence that McMahon had reason to retaliate, Amthor asserts a "cat's paw" theory: McMahon's conduct at the step-three grievance meeting was based on his acceptance of Acre's recommendations, which, in turn were based on Acre's retaliatory motive. (Pl.'s Resp. to Union's Mot. at 16.) *See also Staub v. Proctor Hosp.*, 562 U.S. 411, ---, 131 S. Ct. 1186, 1190 (2011) (describing a "cat's paw" case as one where an employee seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision"). But the Court has already concluded that Amthor has not established that a "significant factor" motivating Acre's conduct was his EEOC testimony, so it follows that it was not a "significant factor" in McMahon's conduct.

Amthor's retaliation claim under Title VII and ELCRA against McMahon thus fail as a matter of law.

## C.

Amthor's Title VII and Elliott-Larsen Civil Rights Act claims against the two unions, Macomb County Juvenile Justice Association and Police Officers Association of Michigan, are premised on a jury finding that Acre or McMahon are liable for retaliation under those two acts. (*See* Compl. ¶¶ 74, 80.) But, as explained, no reasonable jury could so find. The Macomb County Juvenile Justice Association and the Police Officers Association of Michigan are therefore also entitled to summary judgment on Counts I and II.

## V.

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Macomb County, Seidelman, and Bathanti's Motion for Summary Judgment (Dkt. 33). To the extent that Counts I and II assert that Seidelman retaliated against Amthor by moving Amthor to

the night shift in violation of Title VII and the Elliott-Larsen Civil Rights Act, the motion will be DENIED. The Court GRANTS (in full) the Police Officers Association of Michigan, Macomb County Juvenile Justice Association, Acre, and McMahon's Motion for Summary Judgment (Dkt. 34).

      SO ORDERED.

                              s/Laurie J. Michelson
                              LAURIE J. MICHELSON
                              UNITED STATES DISTRICT JUDGE

Dated:  April 20, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 20, 2015.

                              s/Jane Johnson
                              Case Manager to
                              Honorable Laurie J. Michelson